IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

HARRY W. TOLLEY, JR.,

    Plaintiff,

v.

MERCER UNIVERSITY,

    Defendant.

CIVIL ACTION NO.
1:20-cv-02453-VMC-RDC

## FINAL REPORT AND RECOMMENDATION

This is an employment discrimination case. Plaintiff Harry W. Tolley, Jr., a Caucasian male, alleges that Defendant Mercer University unlawfully refused to hire him based on his race. Following discovery, Mercer moved for summary judgment. (Doc. 54). As explained below, the undersigned **RECOMMENDS** that Mercer's motion for summary judgment be **GRANTED**.

## I. BACKGROUND

The dispute concerns Plaintiff's unsuccessful application for a professorship at Mercer's McAfee School of Theology ("McAfee") in the Fall of 2018. The position at issue—Professor of New Testament Studies—opened due to the retirement of a long-tenured African-American professor and pastor. After a multi-step selection process led by a three-member search committee, Mercer ultimately selected Dr. Angela Parker, an African-American female, to fill the position.

Plaintiff contends he was rejected in the early stages of consideration because he is Caucasian. The relevant facts are as follows.[1]

### A. Factual Background

Sometime in 2018, McAfee's Interim Dean—Dr. Greg DeLoach—appointed a three-member search committee to oversee the selection process for the open New Testament Studies professorship. (DSMF ¶ 5). The three committee members were McAfee professors Dr. Karen Massey, Dr. Dave Garber, and Dr. Nancy deClaisse-Walford. (DSMF ¶ 6). McAfee's student body was roughly fifty percent African-American at the time and the School's accrediting agency—the Association of Theological Schools—had recently advised it to consider faculty and staff diversity when making new hires. (PSMF ¶ 21; Doc. 54-6 at 44; Doc. 54-8 at 69–70; Doc. 54-9 at 65–66).[2] With respect to the candidate search at issue, Dean DeLoach stated in an email to a colleague that "all things being equal a person of color would be preferred," but his express and repeated directive to the search committee was to find the "best New Testament faculty person" available for the position, regardless

---

[1] The relevant facts are taken from the parties' respective statements of material facts, (Doc. 54-1 [Defendant's Statement of Material Facts, "DSMF"]; Doc. 74-2 [Plaintiff's Statement of Material Facts, "PSMF"]), and responses thereto, (Doc. 74-1 [Plaintiff's Response, "PR"]; Doc. 76-5 [Defendant's Response, "DR"]), together with other portions of the record as appropriate. Where the parties offer conflicting accounts of the events in question, the undersigned draws all inferences and presents all evidence in the light most favorable to Plaintiff as the non-moving party. *See Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1318 (11th Cir. 2012).

[2] A note on deposition citations: all references are to ECF page numbers rather than transcript page numbers.

of demographic considerations. (Doc. 54-6 at 75–76; Doc. 54-7 at 28–29; Doc. 54-8 at 70–71; Doc. 74-3 at 31).

Based on qualifications established by the search committee, a job description for the professorship was posted on Mercer's website in September 2018. (DSMF ¶¶ 7–8). The job description stated: "Candidates must have a PhD in New Testament, Biblical Studies, or a related field from an accredited college/university by June 2019." (DSMF ¶ 3). Among the "desirable qualities" important for the position, the description listed the following:

- A strong commitment to the church and bridging the gap between the academy and the church.

- A keen attentiveness to issues pertaining to gender, race, and cultural diversity.

- A robust research and publication agenda.

- Online teaching experience.

(DSMF ¶ 4).

For context, McAfee operated as a Baptist seminary and its founding purpose—as memorialized in its mission statement—was, simply put, to "prepare ministers in congregational settings." (Doc. 54-6 at 86–88; Doc. 54-7 at 29; Doc. 54-9 at 23). Accordingly, the School generally eschewed purely theoretical academic work and instead emphasized congregation work and the ability to teach and inform church practices. (Doc. 54-6 at 87–88; Doc. 54-9 at 23–25). In that

regard, Dr. Walford[3]—the committee's chairperson—observed that there is "a wide chasm between the church and the academy," and she explained that the search committee hoped to bring someone in who could bridge the gap in and out of the classroom. (Doc. 54-8 at 26). She added that, "in our day and age, in our multicultural world," this required a "keen attentiveness to gender, race and cultural diversity." (*Id.*).

Plaintiff applied for the professorship in October 2018. (DSMF ¶ 1). With a background that included a master's degree in Christian Origins, a Ph.D. from the University of Pennsylvania specializing in the New Testament and Ancient Mediterranean history and archeology, several publications, and multiple adjunct professorships, he believed he was a good candidate for the job. (PSMF ¶¶ 2–5, 7; Doc. 54-4 at 21–25). And further in his favor, so he thought, it just so happened that he had a distant family relationship with a professor at McAfee, Dr. Loyd Allen. (PSMF ¶¶ 12, 13). To be precise, Plaintiff's wife was the step-niece of Dr. Allen's cousin. (Doc. 54-5 at 56). Although neither Plaintiff nor his wife had any meaningful prior relationship with Dr. Allen, she reached out and put the two in touch. (Doc. 54-5 at 59; Doc. 54-10 at 19–21).

Plaintiff spoke with Dr. Allen on the phone about McAfee and the open

---

[3] The parties refer to Dr. Nancy deClaisse-Walford as "Dr. Walford" throughout their briefing, so the undersigned adopts that convention in this report.

4

professorship sometime in November 2018. (DSMF ¶ 28; PSMF ¶¶ 13–14). At his deposition, Dr. Allen remembered the call itself but was unable to recall many details from the conversation. (Doc. 54-10 at 26–27). Plaintiff, on the other hand, took notes during the call and recounted the following. (Doc. 54-5 at 62–63). According to Plaintiff, Dr. Allen—who is Caucasian—assumed he too was a Caucasian male, and informed him that being female and a person of color would probably be an advantage in the hiring search. (PSMF ¶¶ 15, 20). Dr. Allen added that, in his opinion, the racial makeup of the faculty at McAfee was going to have to change to better reflect the racial makeup of the student body. (PSMF ¶ 17). And Dr. Allen explained that he felt the School "owe[d] it to our students to hire another African American professor to take [the departing professor's] place." (PSMF ¶ 18).

Within days of his call with Plaintiff, Dr. Allen spoke briefly with Dr. Garber of the search committee simply to confirm receipt of Plaintiff's application—as he had promised Plaintiff when they spoke. (PSMF ¶ 19; Doc. 54-10 at 32–34). In the process of doing so, Dr. Allen testified that he "probably" mentioned to Dr. Garber that Plaintiff was a distant relative. (PSMF ¶ 19; Doc. 54-10 at 52). To be clear, however, Dr. Allen was not on the search committee himself and had no influence on the selection process. (DSMF ¶ 29). Nor did he have any other search-related contact or conversations with any of its members outside of later faculty discussions

regarding the final candidates, as detailed below. (DSMF ¶ 30).

Mercer received a total of 109 applications for the New Testament Studies professorship, including Plaintiff's. (DSMF ¶ 9). The search committee was provided with each candidate's application materials—which included a curriculum vitae, cover letter, references, and teaching statement—in electronic format via an online register. (DSMF ¶ 10; PSMF ¶ 23). While Mercer's human resources department generally collects demographic data from applicants for statistical purposes, that information is not passed along to decisionmakers like the members of the search committee in this case. (DSMF ¶¶ 11, 13; Doc. 54-4 ¶ 20). That said, Dr. Walford emailed the other committee members about one particular candidate with whom she was familiar, stating that she "like[d] him very much . . . . [b]ut he is a white male . . . sigh!" (Doc. 74-3 at 13). Moreover, some of the professorship candidates chose to include demographic details—for example, race or sexual orientation—in their cover letters. (PSMF ¶¶ 24–25). That was not the case with Plaintiff, however, who omitted demographic information, including his race, from his application materials. (DSMF ¶¶ 12, 14). And each member of the search committee, along with Dean DeLoach, swore in affidavit testimony that they were unaware of Plaintiff's race during the selection process.[4] (DSMF ¶ 14;

---

[4] Plaintiff also admitted at his deposition that he didn't know whether the search committee was aware of any candidate demographic information during the initial round of the selection process. (Doc. 54-5 at 99).

Docs.76-1, 76-2, 76-3, 76-4).

To pare down the large number of candidates, each committee member first individually examined the applications. (Doc. 54-7 at 34; Doc. 54-8 at 30–32; Doc. 54-9 at 33–35). They then convened as a group to share thoughts and discuss those candidates that stood out during the initial review. (Doc. 54-7 at 34; Doc. 54-8 at 30–32; Doc. 54-9 at 33–35). Between them, the committee members decided to move forward with interviews of fourteen candidates, nine of whom were Caucasian. (DSMF ¶ 15; Doc. 54-4 ¶ 26; Doc. 54-5 at 117). Plaintiff did not make this first cut. (DSMF ¶¶ 16, 31).

None of the committee members had any independent recollection of Plaintiff's name or application, but on subsequent review of his materials, Dr. Garber and Dr. Massey explained why he wasn't selected during the first round of cuts. (Doc. 54-7 at 83–84; Doc. 54-8 at 85; Doc. 54-9 at 83). For instance, Dr. Garber and Dr. Massey both noted that Plaintiff's research was very good but centered on archeology and history, raising concern that his approach would not "bridg[e] the gap between the church and academy," which was an important consideration in the search. (Doc. 54-7 at 86; Doc. 54-9 at 84). As Dr. Massey put it: "We were not looking for a historian. We were not looking for an archaeologist." (Doc. 54-7 at 86). Dr. Massey added that, while Plaintiff's degrees were impressive, none of the schools he attended or taught at were theological schools like McAfee,

whose purpose was to prepare students for the ministry. (Doc. 54-7 at 84–85; Doc. 54-4 at 21–23). Further, as Dr. Massey explained, Plaintiff's application did not indicate active church involvement, membership in any Biblical literature professional organizations, or experience as a full-time professor—indeed, Plaintiff had only taught as an adjunct, which the committee considered a red flag. (DSMF ¶ 32; Doc. 54-7 at 87).

The search committee held in-person interviews of the fourteen semi-finalists in November 2018. (Doc. 54-6 at 50–51; Doc. 54-8 at 41). Dr. Massey was unable to participate. (Doc. 54-6 at 52). So, Dr. Walford and Dr. Garber conducted the interviews and later shared notes with Dr. Massey and two student representatives who had been chosen to consult in the process. (Doc. 54-7 at 41–43; Doc. 54-8 at 41; Doc. 54-9 at 40–45, 56–57). After further discussion and deliberation, the committee settled on three finalists—Dr. Parker; Dr. Chris Holmes, a Caucasian male who had recently completed a two-year teaching fellowship at McAfee; and Dr. Anna Bowden, a Caucasian female. (DSMF ¶¶ 17–18; Doc. 54-6 at 69–70; Doc. 54-9 at 50).

Each of the three finalists was then invited to McAfee to meet members of the faculty and administration and to provide a guest lecture to students. (DSMF ¶ 17; PSMF ¶ 27; DR ¶ 27). After the finalists wrapped up their respective visits, the search committee met and eliminated Dr. Bowden from contention due to her

relative inexperience. (Doc. 54-6 at 68–69; Doc. 54-7 at 59; Doc. 54-8 at 60–61). The committee then presented Dr. Parker and Dr. Holmes—the two remaining candidates—to the full McAfee faculty for discussion. (PSMF ¶¶ 34–35; Doc. 54-6 at 70–71). Both candidates had impressed during their visits, and some students even petitioned for Dr. Holmes. (Doc. 54-6 at 79–80; Doc. 54-7 at 60; Doc. 54-9 at 63–64; Doc. 74-3 at 31).

As a result, the search committee decided to convene a second faculty meeting to vote on the matter. (PSMF ¶¶ 35, 37; Doc. 54-6 at 74–79). Dean DeLoach took notes during the meeting and recorded faculty remarks about each candidate. (Doc. 74-3 at 8–10). Regarding Dr. Parker, faculty commented that she was "engaging," "impressive," and "a natural teacher." (Doc. 74-3 at 8). They also lauded her scholarship, research agenda, and collegiality, while Dr. Allen added that her race was a plus as she could help connect with African-American churches and donors. (*Id.*). As for Dr. Holmes, he too was described as a "good teacher" with "solid scholarship," but two non-committee faculty members opined that the School needed more diversity. (Doc. 74-3 at 9). The committee members themselves split, with Dr. Garber voting for Dr. Parker while Dr. Walford and Dr. Massey both favored Dr. Holmes. (PSMF ¶ 38; Doc. 54-7 at 64; Doc. 54-8 at 66; Doc. 54-9 at 67).

In the end, Dr. Parker carried the majority of faculty votes by secret ballot.

(DSMF ¶ 19; PSMF ¶ 39; Doc. 54-6 at 80–81; Doc. 54-8 at 63–65). Dr. Parker, a womanist scholar[5] and ordained Baptist minister, had a Ph.D. in Bible, Culture, and Hermeneutics [6] with a New Testament focus that satisfied the requisite qualifications for the open position, and according to Dean DeLoach, her emphasis on womanist studies aligned well with the search committee's hope that the new hire would be able to contextualize Biblical text for students. (DSMF ¶ 21; Doc. 54-6 at 100–01). Dr. Parker was a full-time assistant professor at another higher-education institution at the time, had a history of church engagement, and had experience teaching at a seminary. (DSMF ¶ 20; Doc. 54-7 at 69; Doc. 54-8 at 197–202). As Dr. DeLoach testified, Dr. Parker's active engagement with the church and focus on contextualizing the Bible were especially important to the faculty because of the School's focus on ministry. (Doc. 54-6 at 86–88). The committee also observed that Dr. Parker was an engaging and energetic lecturer. (DSMF ¶ 22).

---

[5] "Womanism" refers to a form of feminism focused especially on the conditions and concerns of African-American women. Merriam-Webster, https://www.merriam-webster.com/dictionary/womanism.

[6] "Hermeneutics" refers to the study of the principles of interpretation. Merriam-Webster, https://www.merriam-webster.com/dictionary/hermeneutic. As explained by the Stanford Encyclopedia of Philosophy: "Traditionally, disciplines that rely on hermeneutics include theology, especially Biblical studies, jurisprudence, and medicine, as well as some of the human sciences, social sciences, and humanities. . . . For example, in theology, Biblical hermeneutics concerns the general principles for the proper interpretation of the Bible." Stanford Encyclopedia of Philosophy, https://plato.stanford.edu/entries/hermeneutics/. More specifically, "hermeneutics is concerned, first of all, to clarify and, in turn, to establish the scope and validity of interpretive experience." *Id.*

According to Dr. Garber, Dr. Parker's enthusiasm for teaching and her ability to communicate with students distinguished her among the candidates. (Doc. 54-9 at 67). Dr. Massey shared a similar sentiment, testifying that Dr. Parker "blew the top off" of her teaching demonstration. (Doc. 54-7 at 47–48).

Although the search committee shepherded the selection process and could have overruled the faculty's vote, they elected to adopt and pass along the faculty's recommendation to Dean DeLoach. (DSMF ¶ 24; PSMF ¶ 42; Doc. 54-6 at 90; Doc. 54-9 at 70). He, in turn, approved and forwarded the recommendation to Mercer's University Provost. (DSMF ¶ 24). The Provost then presented the recommendation to Mercer's President, who approved and offered the professorship to Dr. Parker. (DSMF ¶¶ 25–26). Sometime after Dr. Parker was hired, contrary to Mercer's document retention policy, both Dr. Walford and Dr. Massey destroyed handwritten notes they accumulated during the selection process. (PSMF ¶¶ 44, 46, 47).

### B. Procedural Background

Plaintiff initiated this action in June 2020, asserting race discrimination claims based on Mercer's failure to hire him under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") (Count One), and 42 U.S.C. § 1981 ("Section 1981") (Count Two). (Doc. 1). Mercer moved for summary judgment,

11

(Doc. 54), and after full briefing, the motion is now ripe.[7]

## II. LEGAL STANDARD

A reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). Generally, "[t]he mere existence of a

---

[7] In addition to the normal rounds of briefing, the undersigned granted Plaintiff the opportunity to file a sur-reply to further argue certain issues. (Docs. 73, 77).

scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If, in response, the non-moving party does not sufficiently support an essential element of her case as to which she bears the burden of proof, summary judgment is appropriate. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000).

Genuine issues in dispute are those for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "In determining whether genuine issues of material fact exist, [the reviewing court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Rice-Lamar*, 232 F.3d at 840 (citing *Anderson*, 477 U.S. at 255). When the record "taken as a whole" could not lead a rational trier of fact to find for the non-movant, however, there is no "genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

In its motion for summary judgment, Mercer first argues that Plaintiff has failed to make out a *prima facie* case of race discrimination. Specifically, Mercer insists Plaintiff has failed to show he was minimally qualified for the open professorship. Mercer points out in particular that Plaintiff's educational and research focus was on history and archeology rather than Biblical interpretation and

contextualization, he did not receive a degree from a theological institute, and his teaching experience was limited to adjunct positions. Next, Mercer contends that, in any event, the undisputed evidence rebuts any inference of intentional discrimination. On that score, Mercer continues, all members of the search committee submitted sworn affidavits attesting that they weren't even aware of Plaintiff's race when his application was reviewed and rejected. [8] Moreover, doubling down on its initial argument, Mercer insists Plaintiff was not the best qualified individual for the position.[9] (Docs. 54-2, 76).

---

[8] Plaintiff argued that the Court should disregard this argument and the search committee affidavits Mercer submitted in support, insisting that Mercer raised the argument for the first time in reply. (Doc. 70). Plaintiff is incorrect. Regarding the argument, in its motion for summary judgment and its statement of facts, Mercer underscored the search committee's lack of knowledge concerning Plaintiff's race. *See* (Doc. 54-2 at 4–5; DSMF ¶ 14). As for the supporting affidavits, a party may introduce evidence in reply to address arguments raised by an opponent in a response brief. Because Plaintiff argued the search committee did in fact have knowledge of his race during the selection process, the Court may properly consider the affidavits. *See Saenz v. Old Dominion Freight Line, Inc.*, No. 1:18-cv-4718-TCB, 2019 WL 6622840, at *2 (N.D. Ga. June 7, 2019) ("[A]lthough the Court agrees that new evidence submitted with a reply brief usually is improper, such evidence is permissible when it is submitted only to respond to the opponent's argument made in a response brief."). In any case, as already noted, the undersigned granted Plaintiff the opportunity to further address the issue in a sur-reply brief. (Docs. 73, 77).

[9] In its reply brief, Mercer also argued for the first time that Plaintiff's claims are barred under the so-called "ministerial exception" to federal employment discrimination laws as applied to religious institutions. Under this rule, which derives from the First Amendment's Religion Clauses, "courts are bound to stay out of employment disputes involving those holding certain important positions with churches and other religious institutions." *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S.Ct. 2049, 2060 (2020). The rule "was recognized to preserve a church's independent authority in such matters." *Id.* at 2061. The parties disagree as to whether this defense is waivable in the first instance and, if so, whether Mercer in fact waived it by initially raising it in reply. However, for reasons stated in this report, the undersigned concludes that Plaintiff's claims fail on the merits. Therefore, this report need not—and does not—address the applicability of the ministerial exception to Plaintiff's claims.

14

In response, Plaintiff contends that he both made out a *prima facie* case and rebutted Mercer's proffered rationale. First, he argues that evidence shows he at least minimally satisfied the objective criteria included in the posted job description, which is all the *prima facie* case requires. Moreover, Plaintiff argues that circumstantial evidence—such as Dr. Allen's remarks, the accreditation emphasis on diversity, faculty comments, and the search committee's destruction of certain handwritten notes after Dr. Parker's hire—calls into question the veracity of Mercer's race-neutral explanation and otherwise supports an inference of unlawful discrimination. (Docs. 74, 77).

### A. Legal Standards

We begin with the law. Title VII prohibits an employer from using race "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Section 1981 does likewise. 42 U.S.C. § 1981; *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) ("Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts."). Courts generally review race discrimination claims under Title VII and Section 1981 using the same analytical framework. *Lewis v. City of Union City, Ga.*,

918 F.3d 1213, 1220 n.5 (11th Cir. 2019) (*en banc*).[10]

When a plaintiff relies on circumstantial evidence to prove discrimination, as Plaintiff does here, courts employ the familiar burden-shifting framework set out by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff creates a rebuttable presumption of unlawful discrimination by first establishing a *prima facie* case. *See Lewis*, 918 F.3d at 1220–22. The burden then shifts to the employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221. The employer's burden at this stage "is exceedingly light." *Perryman v. Johnson Prods. Co.*, 698 F.2d 1138, 1142 (11th Cir. 1983). It is merely a burden of production, not a burden of proof. *Id.* If the employer proffers a legitimate nondiscriminatory explanation, the burden returns to the plaintiff to prove the employer's reason is merely a pretext for unlawful discrimination. *See Lewis*, 918 F.3d at 1221. The plaintiff may demonstrate pretext by revealing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl.*

---

[10] Notably, the U.S. Supreme Court recently held in *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020), that Section 1981 and Title VII have *different* causation standards. It follows that, at least in some cases now, the analytic framework appropriate for these two statutes will also be different. *See Henderson v. City of Birmingham, Ala.*, 826 F. App'x 736, 740 n.2 (11th Cir. 2020) (explaining that, after *Comcast*, "§ 1981's pleading standard for discrimination claims is at least as, if not more, restrictive than Title VII"). Insofar as it is relevant in this case, the distinction between Title VII and Section 1981 is further addressed below, *infra* Note 12.

*Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (citation omitted). If the employer's reason is one "that might motivate a reasonable employer," the plaintiff must "meet that reason head on and rebut it, and the [plaintiff] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). With that in mind, "a plaintiff cannot prove pretext by simply arguing or even by showing that he was better qualified than the [person] who received the position he coveted." *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted).

Although the *McDonnell Douglas* framework is one way of showing discriminatory intent, it is not the only way. *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. *Id.* "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (citation omitted). A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext. *Lewis v. City of Union City, Ga.*, 934

F.3d 1169, 1185 (11th Cir. 2019).

### B. McDonnell Douglas Framework

The arguments presented are first situated within the *McDonnell Douglas* burden-shifting framework, starting with Plaintiff's *prima facie* case. To establish a *prima facie* case in this context, a plaintiff must establish that: (1) he was a member of a protected class; (2) he applied and was qualified for a position for which the employer was accepting applications; (3) despite his qualifications, he was not hired; and (4) the position remained open or was filled by another person outside of his protected class. *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272–73 (11th Cir. 2002). Here, the parties' quarrel concerns the second element—namely, Plaintiff's qualifications for the open professorship.

Because Plaintiff at least minimally satisfied the objective qualifications for the position as described by the search committee in the New Testament Studies job posting, the undersigned finds that he satisfied his *prima facie* burden. The question at this initial stage is not whether Plaintiff was the *best* qualified candidate—that important question, on which Mercer has much to say, is addressed "at the later stages of the *McDonnell Douglas* framework." *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 769 (11th Cir. 2005). Instead, to show he was qualified for the position at the *prima facie* stage, a plaintiff need only show that he satisfied an employer's objective qualifications. *Id.* That is the case here.

Plaintiff's credentials included a Ph.D. specializing in the New Testament from a well-respected university, a track record of publications with an active research agenda, and more than a decade of teaching experience that included online instruction. (Doc. 54-4 at 21–28). Though harder to objectively verify, Plaintiff in his application materials at least confirmed—albeit in passing—his commitment to both the church and multiculturalism in the classroom. (*Id.* at 26).[11] With these *bona fides* and affirmations, Plaintiff met the most basic requirements of the open professorship and satisfied his *prima facie* case.

So, moving on, the next issue is whether Mercer presented a legitimate reason to rebut the corresponding presumption of discrimination. *See Lewis*, 918 F.3d at 1220–22. On either of two independent grounds, the undersigned concludes that it did. To start, Mercer has presented evidence that none of the search committee members—that is, the individuals solely responsible for reviewing and rejecting Plaintiff's application—was aware of Plaintiff's race during the selection process. That alone is enough to doom his claims. *See Walker v. Prudential Prop. and Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) ("When evaluating a charge of employment discrimination, . . . we must focus on the actual knowledge and actions

---

[11] Plaintiff stated in his cover letter: "I have a strong commitment to the Christian church and a great respect for people of faith regardless of tradition. My personal views on gender, race and cultural diversity were deeply influenced by my time at the University of Pennsylvania." (Doc. 54-4 at 26). He didn't meaningfully elaborate on either point.

of the decision-maker."). Whatever demographic information Mercer's human resources department collected from the initial 109 candidates was withheld from the committee, leaving only limited self-disclosures remaining in the candidates' application materials. Although some candidates made such disclosures with respect to race, Plaintiff did not. And again, each of the committee members presented sworn affidavit testimony disclaiming *any* knowledge of Plaintiff's race during their decisionmaking.

In response, Plaintiff points to a lone piece of evidence he believes raises a question of fact on the issue. As Plaintiff points out, Dr. Allen—a Caucasian male—testified that he spoke briefly with Dr. Garber on the search committee to confirm receipt of Plaintiff's application and, in doing so, "probably" mentioned his distant family relationship to Plaintiff. From that mere mention, Plaintiff suggests it is *possible* Dr. Garber inferred that Plaintiff, the husband of Dr. Allen's cousin's step-niece, was also Caucasian. However, stacking possibility on probability as Plaintiff suggests can establish no more than a speculative and very faint specter of racial cognizance on Dr. Garber's part. *See Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment."). That is not enough at this stage.

But even if Plaintiff's posited inference is credited there is a further problem—

namely, it does nothing to suggest that either Dr. Walford or Dr. Massey, who each independently scratched Plaintiff from consideration, were also aware of Plaintiff's race. *Cf. Conner v. Lafarge N. Am., Inc.*, 343 F. App'x 537, 544 (11th Cir. 2009) (holding that an unlawful motive on the part of one member of a decisionmaking authority cannot be imputed to the entire group). In short, then, Plaintiff has not raised a genuine question of fact regarding the search committee's actual knowledge of Plaintiff's race. And without such knowledge, his claims fail. *See Walker*, 286 F.3d at 1274; *see also Silvera v. Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001) ("Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent."); *Fagerstrom v. City of Savannah, Ga.*, 627 F. App'x 803, 805 (11th Cir. 2015) ("Without *knowledge* of [the plaintiff's] racial identity, [the employer] cannot have acted with an *intent* to discriminate based on that identity.")

In any event, Plaintiff has also failed to rebut Mercer's nondiscriminatory explanation for rejecting his application. Although the undersigned has concluded Plaintiff was minimally qualified for the New Testament Studies professorship, it was up to Mercer's decisionmakers *at that time*—not this Court, *at this time*—to determine whether he was the *best* qualified candidate. *See Chapman*, 229 F.3d at 1030 (explaining that a reviewing court does not "sit as a super-personnel department that reexamines an entity's business decisions"). Multiple members of

the search committee testified that, in their opinion, he was not. Although Mercer's burden at this stage is "exceedingly light," *Perryman*, 698 F.2d at 1142, the evidence here amounts to something heavier.

McAfee is a seminary whose principal purpose is to prepare ministers. Yet, at odds with that purpose, Plaintiff's application did not demonstrate a long record of engagement with the church and church practice. He was not educated in any theological schools, nor had he taught in them. To be sure—as Dr. Garber and Dr. Massey acknowledged at their depositions—Plaintiff has impressive educational and research credentials. Even in that regard, however, Plaintiff's qualifications were not *so* exemplary "that no reasonable person, in the exercise of impartial judgment, could have chosen" Dr. Parker or the other thirteen, mostly Caucasian semi-finalists over him. *See Monds v. Quitman*, 767 F. App'x 750, 754 (11th Cir. 2019). Plaintiff's educational history was impressive, to be sure, but not singularly so.

But in any case, education and research were just pieces of the larger pedagogical puzzle here. Mercer's decisionmakers had every right to consider other factors like the candidates' church involvement (Plaintiff demonstrated very little), seminary training and teaching (Plaintiff had none), commitment to interpreting and contextualizing Biblical text for diverse audiences (Plaintiff's professed focus was on historical analysis), and prior full-time professorships (Plaintiff had none). And

along these other dimensions, the search committee could reasonably conclude that Plaintiff's credentials fell short.

By contrast, Dr. Parker was an ordained minister and actively involved in the church. She received her Ph.D. in Biblical hermeneutics from a theological school and held a full-time professorship at the time of selection. Her academic focus was on interpreting the Bible from a womanist perspective, which fit nicely with McAfee's legitimate candidate wish list. As Dr. Massey explained, "hermeneutics was a significant piece of what we were looking for, Biblical interpretation of the scripture, texts, and particularly in [the candidates'] writings and publications as well." (Doc. 54-7 at 86). The search committee's charge was to find the best candidate, and as they explained under oath, that meant finding someone who could teach the Bible in a way that would help students engage with diverse perspectives while training for the ministry. Operating under that directive, the committee had nondiscriminatory reasons to reject Plaintiff's application and ultimately select Dr. Parker.

Plaintiff tries in response to tie together a catalog of evidence that he insists undermines Mercer's legitimate explanation, but that effort does not carry the day. Specifically, Plaintiff points to the commitment to faculty diversity as underscored by McAfee's accreditation agency, Dr. Allen's remarks about the School and hiring process along with certain faculty remarks made during pre-vote deliberations, and

the search committee's destruction of notes after Dr. Parker was hired, all of which he argues suggest that race—rather than qualifications—was the real reason for his rejection. The undersigned disagrees.

To make clear the issue at this stage so that it doesn't get lost in the shuffle of arguments, the question is whether Plaintiff has shown "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Mercer's qualifications-based rationale that a jury could reasonably conclude it was mere pretext for intentional race discrimination. *See Alvarez*, 610 F.3d at 1265. In other words, has Plaintiff demonstrated *both* that Mercer's proffered explanation was false *and* that discrimination was the real reason? *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). He has not. To start, the accreditation agency's general appeal to diversity in hiring means very little when considered on its own. What matters is how that appeal was operationalized in this case, and as the evidence shows, Dean DeLoach repeated throughout the search process that the committee's task was to identify the best candidate regardless of demographics. In other words, diversity was not—per Dean DeLoach's express order—determinative. As for Dr. Allen's remarks, he was not on the search committee and by his own admission he had no influence on the process aside from his faculty vote after Plaintiff had been eliminated from contention. The import of such statements from non-decisionmakers is very limited. *See Rowell v. BellSouth Corp.*, 433 F.3d 794, 802

(11th Cir. 2005); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1079 (11th Cir. 2003) ("[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process at issue will not satisfy the employee's burden [to show pretext]." (citation omitted)).

Moving on to the pre-vote faculty comments, these are the most troubling bits of evidence in the record. There are, as Plaintiff points out, multiple references to certain candidates' races in various emails and notes recorded by Dr. Walford and Dean DeLoach. But these scattered references do not show the selection process was so infected with racial considerations as to support an inference that Plaintiff himself was excluded because of his race. *Cf. Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998) (holding that circumstantial evidence, including supervisor's statements about "black girls" made one week before the plaintiff's termination, was insufficient to support an inference of race discrimination). In order to show pretext, the employer's rationale must be false—"[p]retext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action." *Silvera*, 244 F.3d at 1261 (citation omitted). Yet, the very same faculty notes at issue here include multiple references to legitimate qualifications, highlighting criteria such as the candidates' experience, scholarship, research agendas, teaching ability, and collegiality. (Doc. 74-3 at 8–9). Thus the evidence Plaintiff has distilled in his briefs is, when viewed in context, diluted in

fact. Read in their entirety, the notes of McAfee's faculty deliberations are entirely of a piece with the testimony of Dr. DeLoach and the search committee members already recounted above, which showed the School was committed to hiring the most legitimately qualified candidate and that, at least in the eyes of the committee, Plaintiff was not that person. He has not shown Mercer's explanation was false, nor has he shown that he was instead rejected because of his race.

Finally, as for the destruction of Dr. Walford and Dr. Massey's handwritten notes after the professorship was filled, an inference of pretext is generally only available if a deviation from an employer's standard procedures is predicated on bad faith. *See Keaton v. Cobb Cnty.*, 545 F. Supp. 2d 1275, 1306–1308 (N.D. Ga. 2008); *accord Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith."). There is no such evidence here. Instead, Dr. Walford and Dr. Massey each swore to non-nefarious explanations. Dr. Walford stated that she held her notes for "about 18 months" but likely got rid of them when she cleaned her office at the end of the academic year following Dr. Parker's hire because "there was no need to keep them anymore." (Doc. 54-8 at 38–39). As for Dr. Massey, she testified that she shredded her notes sometime after the selection process was complete because Mercer kept original copies of all application materials and she understood that personal copies were supposed to be destroyed.

(Doc. 54-7 at 34–35). Plaintiff has pointed to no evidence to discredit these explanations or otherwise suggest bad faith. At most, then, this evidence demonstrates only that members of the search committee were negligent, but that is not enough. *See Keaton*, 545 F. Supp. 2d at 1308 (holding that "the mere possibility of a bad motive to destroy" an employer's interview notes, without evidence of bad faith, is insufficient to survive summary judgment); *Drakeford v. Ala. Co-op. Ext. Syst.*, 416 F. Supp. 2d 1286, 1310 (M.D. Ala. 2006) ("All of the evidence points to committee members destroying their notes in the good faith belief that doing so would ensure the confidentiality of the search. Because the facts and circumstances do not indicate bad faith on the part of Defendants, the committee members' decision to destroy their notes does not trigger an inference of discrimination, and summary judgment is not precluded.").

For the preceding reasons, the undersigned concludes that Plaintiff has failed to show Mercer's qualifications-based explanation for rejecting his application was pretext for intentional race discrimination. But for the sake of completeness, this discussion will address two specific cases he relies on to argue the contrary—*Smith v. Lockheed-Martin Corp.* and *Vessels v. Atlanta Ind. Sch. Syst.* Both are distinguishable from the instant case.

First, in *Smith*, the Eleventh Circuit found the plaintiff there had presented enough circumstantial facts to support an inference that he received a disciplinary

termination because he was Caucasian. 644 F.3d at 1341. In doing so, the court relied principally on two key pieces of evidence: (1) the employer had explicitly included race among the categories listed on a decision matrix used to make disciplinary decisions; and (2) similarly situated African-American employees were disciplined more leniently for "virtually identical" conduct. *Id.* With the *Smith* employer's disciplinary decisions bookended by evidence of racial considerations—*i.e.*, pre-decision in the form of the disciplinary matrix, and post-decision in the form of disparate punishments—the court held that it was up to a jury to decide whether unlawful considerations in fact tainted the process in that case. *Id.* at 1346.

In this case, by contrast, demographic information about the candidates was deliberately withheld from the search committee as they embarked on the selection process. And again, Dean DeLoach repeatedly instructed the search committee to hire the best candidate regardless of race. This is precisely the opposite of what happened in *Smith*. Moreover, in *Smith*, the plaintiff identified comparators who had engaged in virtually identical conduct but received different punishments. There was, in other words, clear evidence of disparate treatment. Here, however, Plaintiff has not identified any such comparator. The natural comparator for Plaintiff is Dr. Parker, both because she's African-American and because she was ultimately selected for the professorship. But for reasons already stated that comparison is a poor one. There were material differences in their respective qualifications,

differences highlighted in the search committee's testimony. In brief, both factors that mattered in *Smith*—the deliberate injection of race into the decisionmaking process and disparate decisionmaking results—are absent here.

Next, in *Vessels*, the Eleventh Circuit held that the plaintiff, who was Caucasian, had raised a genuine question of fact concerning the employer's motives in denying him a promotion. 408 F.3d at 772. There, school officials made statements regarding the "superiority" of African-American psychologists in serving African-American schoolchildren, who constituted the majority of the school system's population. *Id.* at 771. In addition, the plaintiff directly contradicted certain facts on which the school's final decisionmaker had purportedly relied in rejecting the plaintiff's candidacy in favor of an African-American candidate. *Id.* Importantly, those facts concerned the respective qualifications of both the plaintiff and the chosen candidate. *Id.* The court also noted that the school appeared to disregard its own employment regulations in selecting the chosen candidate, whose qualifications—in contrast to the plaintiff's—did not meet the school's preferred educational requirements. *Id.* at 772. Taken together, the court concluded, a jury could find the school's legitimate justification for the promotion decision was merely pretext for race discrimination against the plaintiff. *Id.*

Here, Plaintiff's case and the evidence he relies upon are much weaker. There are occasional references to the candidates' races in the decisionmaking record, but

none are as pointed as those present in *Vessels*. Moreover, unlike the plaintiff in *Vessels*, Plaintiff has not directly contradicted any of his or Dr. Parker's respective qualifications, either as presented to the search committee or as weighed during the selection process. In other words, Plaintiff has not suggested the search committee exaggerated the distinctions between himself and Dr. Parker to reach a preferred outcome, as may have happened in *Vessels*. Finally, again in contrast to *Vessels*, Plaintiff has not shown that Mercer may have bent its educational requirements to accommodate a racial preference. Instead, as the record makes plain, the search committee's efforts in this case were directed toward finding the most qualified candidate, and they ultimately approved of someone who they believed best exemplified *all* of the legitimate criteria on their wish list.

To conclude, while Plaintiff met his *prima facie* burden, Mercer has presented evidence to rebut a presumption of intentional race discrimination. Evidence shows the search committee was not aware of Plaintiff's race when they rejected his application. Moreover, Mercer has explained—and the evidence shows—that Plaintiff was passed over and Dr. Parker was ultimately selected for the open professorship based on their respective qualifications. Plaintiff has not genuinely cast doubt on that explanation or otherwise supported an inference that Mercer's decision was the product of unlawful race discrimination. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) ("[A]n employer would be entitled

to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."). For these reasons, Plaintiff's claims fail under the *McDonnell Douglas* framework.

### C. Convincing Mosaic Framework

Moving on, Plaintiff further maintains the record as a whole nevertheless paints a circumstantial mosaic showing that unlawful racial discrimination factored into his rejection.[12] Again, the undersigned disagrees.

Most of the relevant evidentiary ground has been tread at this point, so there is no need for a full recap. There are undisputed aspects of the selection process that stand out when the record is viewed as a unified whole, however, and they cut off Plaintiff's claims. Viewed from altitude, here's a summary of what happened. To

---

[12] To clarify, Plaintiff in his brief purports to assert both single-motive and mixed-motive race discrimination claims. (Doc. 74 at 15). The former is available under both Title VII and Section 1981, while the latter is only available under Title VII. *See, e.g., Powell v. Birmingham Heart Clinic, P.C.*, No. 2:19-cv-00309, 2021 WL 4171350, at *7 n.8 (N.D. Ala. Sept. 14, 2021) ("Under § 1981, a plaintiff must establish that race was the but-for cause of her injury; the mixed-motive option available to plaintiffs for Title VII discrimination claims is not an option for § 1981 discrimination claims." (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009 (2020)). Plaintiff has not presented sufficient circumstantial evidence to support either type of claim. For reasons stated in the following discussion, the undersigned concludes that the circumstantial evidence presented here does not reasonably support an inference that Plaintiff's race caused—in any measure, whether as a motivating factor or something more—the search committee's rejection of his application. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1239 (11th Cir. 2016) (explaining that a plaintiff will survive summary judgment if he presents circumstantial evidence reasonably supporting an inference that race was a "motivating factor" in the employer's action against him); *Smith*, 644 F.3d at 1328 (explaining that a plaintiff will survive summary judgment if he presents circumstantial evidence reasonably supporting an inference that the employer acted with discriminatory intent).

find McAfee's new professor, Dean DeLoach appointed a 3-member search committee and tasked it with finding the best candidate regardless of race. The committee then employed a multi-step selection process that included an individualized, largely race-blind review of 109 applicants, more than a dozen in-person interviews, three campus visits, and much deliberation. Although Plaintiff didn't survive the first round of cuts, most of the fourteen semi-finalists—and two of the three finalists—were Caucasian. *Cf. Williams v. Hous. Opportunities for Persons with Exceptionalities*, 777 F. App'x 451, 455 (11th Cir. 2019) (concluding that the plaintiff failed to establish a circumstantial mosaic of race discrimination, in part, because the employer filled the plaintiff's position after termination with people of the same race). Dean DeLoach and student representatives were consulted in the process, and at its culmination the committee's final two candidates were presented to the entire School faculty for discussion over two days.

Dr. Parker, an African-American female, won the faculty vote by secret ballot—notably, over the vote of two committee members who initially preferred her Caucasian competitor. The committee then ratified the full vote and forwarded the faculty's recommendation along for final approval. There were occasional references to certain (not every) candidates' races during this time period, but those references were generally made by non-committee members and/or after Plaintiff's application had already been rejected. *Cf. Rojas v. Florida*, 285 F.3d 1339, 1341–43

(11th Cir. 2002) (concluding that the female plaintiff's evidence—a supervisor's discriminatory comment that a non-party female employee did not deserve her job because she was a woman—was insufficient to show pretext because it was an isolated comment, unrelated to the decision to terminate the plaintiff). The undersigned concludes that the picture emerging from this collected evidence is not a gestalt of intentional race discrimination. Therefore, Plaintiff's claims fail under this rubric as well.

## IV. CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that Mercer's motion for summary judgment, (Doc. 54), be **GRANTED**. The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

IT IS SO **RECOMMENDED** on this 13th day of July 2022.

_____
REGINA D. CANNON
United States Magistrate Judge

33